In the
# UNITED STATES COURT OF APPEALS
for the Seventh Circuit

## Nos.  16-1459 and 16-1694

**UNITED STATES OF AMERICA,**                                  **Plaintiff-Appellee,**

**v.**

**KEVIN JOHNSON and**
**TYLER LANG.**                                            **Defendants-Appellants.**

On Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 14 CR 390—Amy J. St. Eve, *Judge.*

## BRIEF OF THE UNITED STATES

ZACHARY T. FARDON
United States Attorney
for the Northern District of Illinois
219 South Dearborn Street, 5th Floor
Chicago, Illinois  60604
(312) 353-5300

STUART FULLERTON
Assistant United States Attorney
Editor

BETHANY K. BIESENTHAL
Assistant United States Attorney

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................... i

TABLE OF AUTHORITIES ................................................................... ii

JURISDICTIONAL STATEMENT .........................................................1

ISSUES PRESENTED FOR REVIEW ...................................................1

STATEMENT OF THE CASE .................................................................2

SUMMARY OF ARGUMENT ..............................................................8

ARGUMENT .........................................................................................9

I.    The District Court Did Not Err When It Denied Defendants'
Motion to Dismiss the Indictment ...............................................9

    A.    Standard of Review ..........................................................9

    B.    The AETA is not overbroad ............................................9

    C.    The AETA is not vague .................................................. 30

    D.    The AETA does not violate defendants' substantive due
process rights .............................................................. 40

CONCLUSION ................................................................................... 46

# TABLE OF AUTHORITIES

## CASES

*Act Now to Stop War and End Racism Coalition, et al., v. District Of Columbia*, 905 F. Supp. 2d 317 (D.C.D.C. 2012)............................. 37, 38

*American Communications Association v. Douds*, 339 U.S. 382 (1950) ......... 34

*American Life League, Inc. v. Reno*, 47 F.3d 642 (4th Cir. 1995).................... 16

*Bell v. Keating*, 697 F.3d 445 (7th Cir. 2012) ............................................ 31, 32

*Blum v. Holder*, 744 F.3d 790 (1st Cir. 2014)....................................... 25, 29, 30

*Broadrick v. Oklahoma*, 413 U.S. 601 (1973)............................................. 10, 11

*CISPES v. FBI*, 770 F.2d 468 (5th Cir. 1985) ..................................... 16, 25, 26

*Colautti v. Franklin*, 439 U.S. 379 (1979) ....................................................... 35

*Collins v. City of Harker Heights*, 503 U.S. 115 (1992) ................................... 40

*Desertrain v. City of Los Angeles*, 754 F.3d 1147 (9th Cir. 2014).................... 38

*Duncan v. Walker*, 533 U.S. 167 (2001) ........................................................... 13

*Fisher v. King*, 232 F.3d 391 (4th Cir. 2000) .................................................. 24

*Gonzalez v. Carhart, et al.*, 550 U.S. 124 (2007) ............................................ 35

*Goodpaster v. City of Indianapolis*, 736 F.3d 1060 (7th Cir. 2013)................ 41

*Hayden ex rel. A.H. v. Greensburg Community School. Corp.*, 743 F.3d 569 (7th Cir. 2014)............................................................. 40, 41

*Hill v. Colorado*, 530 U.S. 703 (2000) .............................................................. 34

*Hutchins v. District of Columbia*, 188 F.3d 531 (D.C. Cir. 1999)................... 26

*Johnson v. United States*, —U.S.—, 135 S.Ct. 2551, 192 L.Ed.2d 569 (2015)........................................................................... 31

*JWJ Industries, Inc. v. Oswego County*, No. 12-5014-CV, 538 Fed. Appx. 11 (2d Cir. Sept. 4, 2013) ............................................................. 38

*Kolender v. Lawon*, 461 U.S. 352 (1983) ........................................................... 31

*Long v. State*, 931 S.W.2d 285 (Tex. Crim. App. 1996) .................................... 24

*Martinez v. United States*, 803 F.3d 878 (7th Cir. 2015) ................................ 17

*Maynard v. Cartwright*, 486 U.S. 356 (1988) ................................................... 31

*Members of City Council of L.A. v. Taxpayers of Vincent*,
     466 U.S. 789 (1984) ................................................................................. 10

*Metro Produce Distributors, Inc. v. City of Minneapolis*, 473 F. Supp. 2d
     955 (D. Minn. 2007) ................................................................................. 36

*Monterey Coal Co. v. Federal Mine Safety and Health Review
     Commission*, 743 F.2d 589 (7th Cir. 1984) ............................................ 17

*National Labor Relations Board v. Bell Aerospace Company Division of
     Textron, Inc.*, 416 U.S. 267 (1974) ......................................................... 17

*New York v. Ferber*, 458 U.S. 747 (1982) ................................................... 10, 16

*Papachristou v. City of Jacksonville*, 405 U.S. 156 (1972) ........................ 33, 34

*Radiation Sterilizers, Inc. v. United States*, 867 F. Supp. 1465
     (E.D. Wash. 1994) .................................................................................... 23

*Schleifer v. City of Charlottesville*, 159 F.3d 843 (4th Cir. 1998) .................... 26

*State v. Machholz*, 574 N.W.2d 415 (Minn. Sup. Ct. 1998) ............................ 24

*United States v. Bird*, 124 F.3d 667 (5th Cir. 1997) ....................................... 16

*United States v. Buddenberg*, No. CR-09-00263 RMW,
     2009 WL 3485937 (N.D. Cal. Oct. 28, 2009) ..................................... 12, 30

*United States v. Fullmer*, 584 F.3d 132 (2009) ..................................... 21, 22, 35

*United States v. Lanning*, 723 F.3d 476 (4th Cir. 2013) ................................. 38

*United States v. Lim*, 444 F.3d 910 (7th Cir. 2006) ........................................ 31

*United States v. Morris*, 821 F.3d 877 (7th Cir. 2016) ...................................... 9

*United States v. Rodgers*, 755 F.2d 533 (7th Cir. 1985)............................ 31, 35

*United States v. Vest*, 448 F. Supp. 2d 1002 (S.D. Ill. 2006) .................... 36, 37

*United States v. Walton*, 36 F.3d 32 (7th Cir. 1994) ........................................ 31

*United States v. Washington*, 417 F.3d 780 (7th Cir. 2005) ........................... 28

*United States v. Williams*, 553 U.S. 285 (2008) .............................................. 10

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
    455 U.S. 489 (1982)........................................................................... 10, 27

*Waste Management Holdings, Inc. v. Gilmore*, 252 F.3d 316
    (4th Cir. 2001) ............................................................................................. 24

## Statutes

18 U.S.C. § 2332b(g)(5)(B) ......................................................................... 43, 44

18 U.S.C. § 43 .........................................................................................passim

18 U.S.C. § 2332b(g)(5) .................................................................................. 44

42 U.S.C. § 2014............................................................................................. 22

Pub. L. 109-374 ............................................................................................... 3

## Rules

Federal Rules of Appellate Procedure 32(a)(5) ............................................... 47

Federal Rules of Appellate Procedure 32(a)(7)(B) .......................................... 47

## Legislative History

152 Cong. Rec. H8590-01 (2006) ........................................................... 3, 17, 44

152 Cong. Rec. S9254-01 (2006) .................................................................... 18

## JURISDICTIONAL STATEMENT

The jurisdictional statement of defendant Kevin Johnson (appeal no. 16-1459) is complete and correct.   The jurisdictional statement of defendant Tyler Lang (appeal no. 16-1694) is complete and correct.

## ISSUES PRESENTED FOR REVIEW

1.     Whether the district court erred in finding that the Animal Enterprise Terrorism Act (AETA), 18 U.S.C. § 43, is not overbroad, where the statute criminalizes conduct, rather than speech, and specifically exempts First Amendment protected activity from its reach.

2.     Whether the district court erred in finding that the AETA is not void for vagueness, where the statute includes a scienter requirement, there is no ambiguity as to what conduct the statute prohibits, and the statute does not give unfettered discretion to law enforcement to arbitrarily enforce it.

3.     Whether the district court erred in finding that the AETA does not violate defendants' substantive due process rights where the term "terrorism" is mentioned nowhere other than in the statute's non-codified title, and the statute is rationally related to the government's legitimate interest in curtailing criminal conduct against animal enterprises.

## STATEMENT OF THE CASE

On August 13, 2014, defendants Johnson and Lang, after having traveled from California to Illinois, vandalized Mink Farm A.  R. 124 at 3; R. 126 at 3.[1]  Defendants Johnson and Lang released approximately 2,000 mink from their cages, destroyed the breeding cards from the minks' cages, which identified their breed and are required for the subsequent sale of the minks to a furrier, and poured acid on the farm vehicles.  R. 124 at 3; R. 126 at 3. Defendants then planned to vandalize Fox Farm A, but were stopped by police before they reached the farm.  R. 124 at 3-4; R. 126 at 3-4.  Defendants Johnson and Lang caused losses to Mink Farm A of approximately $200,000, including physical damage to the farm and farm vehicles, the replacement cost for the minks, and the lost profits from the farm's inability to sell the minks at their fair value because the breeding cards had been destroyed.   R. 124 at 4, 9; R. 126 at 4, 9.

On July 8, 2014, an indictment was returned charging defendants Johnson and Lang with one count of conspiring to travel in interstate commerce and to use a facility of interstate commerce for the purpose of damaging an animal enterprise, in violation of 18 U.S.C. § 43(a)(2)(C), and

---

[1]   References to documents in the record on appeal are "R.," followed by the document number.   References to defendants' appendix appear as "App. ___." References to defendants' brief appear as "Def. Br. at ___."

one count of traveling in interstate commerce for the purpose of damaging an animal enterprise and causing damage to the animal enterprise, in violation of 18 U.S.C. § 43(a) and 43(b)(2)(A). R. 1. The conspiracy count specifically alleged that defendants conspired to travel in interstate commerce, for the purpose of damaging Mink Farm A and Fox Farm A, and in connection with that purpose, caused damage to the property of Mink Farm A. *Id.*

The charging statute for the two counts in the indictment is the AETA, which was enacted in 2006 in response to "an increase in the number and the severity of criminal acts and intimidation against those engaged in animal enterprises." *See* 152 Cong. Rec. H8590-01 (2006) (Statement of Rep. Sensenbrenner). The AETA was designed to close "serious gaps and loopholes . . . with respect to protecting employees and associates of animal enterprises . . ." *Id.* (Rep. Scott).[2]

The AETA contains five subsections. Section (a) of the AETA defines the "offense":

> (a)    Offense. Whoever travels in interstate or foreign commerce, or uses or causes to be used the mail or any facility of interstate or foreign commerce –

---

[2] The term "terrorism" was included in the title of the AETA and the term "terror" was listed in the AETA's stated purpose: "[t]o provide the Department of Justice the necessary authority to apprehend, prosecute, and convict individuals committing animal enterprise terror." Animal Enterprise Terrorism Act, S. 3880, Pub. L. 109-374, 109th Cong. (2006). However, the AETA, was codified under a title without reference to terror: "[f]orce, violence, and threats involving animal enterprises." 18 U.S.C. § 43.

(1)    for the purpose of damaging or interfering with the operations of an animal enterprise; and

(2)    in connection with such a purpose—

(A) intentionally damages or causes the loss of any real or personal property (including animals or records) used by an animal enterprise, or any real or personal property of a person or entity having a connection to, relationship with, or transactions with an animal enterprise;

(B) intentionally places a person in reasonable fear of the death of, or serious bodily injury to that person, a member of the immediate family . . . of that person, or a spouse or intimate partner of that person by a course of conduct involving threats, acts of vandalism, property damage, criminal trespass, harassment, or intimidation, or

(C) conspires or attempts to do so;

Shall be punished under subsection (b).

18 U.S.C. § 43.

The punishment for violating the AETA is set forth in subsection (b) and relies in part on the amount of "economic damage" caused as a result of committing the offense.  18 U.S.C. § 43(b).  The AETA defines "economic damage" as "the replacement costs of lost or damaged property or records . . . the loss of profits, or increased costs, including losses and increased costs resulting from threats, acts of vandalism, property damage, trespass, harassment, or intimidation" inflicted due to a connection to an animal enterprise. 18 U.S.C. § 43(d)(3)(A). Yet economic damage "does not include any lawful economic disruption (including a lawful boycott) that results from

4

lawful public, governmental, or business reaction to the disclosure of information about an animal enterprise . . ." 18 U.S.C. § 43(d)(3)(B).

The AETA also contains "rules of construction." The AETA provides that "[n]othing in this section shall be construed: (1) to prohibit any expressive conduct (including peaceful picketing or other peaceful demonstration) protected from legal prohibition by the First Amendment"; or "(2) to create new remedies for interference with activities protected by the free speech or free exercise clauses of the First Amendment to the Constitution, regardless of the point of view expressed . . ." 18 U.S.C. § 43(e)(1) and (2).

On November 6, 2014, defendants Johnson and Lang jointly moved to dismiss the indictment, arguing that the AETA was unconstitutionally overbroad, vague, and violated defendants' substantive due process rights. R. 63. More specifically, defendants argued that the AETA was facially overbroad because it restricted a substantial amount of constitutionally protected activity. *Id.* at 7-17. In support, defendants argued that the AETA criminalized First Amendment activity that resulted in a loss of profit to an animal enterprise. *Id.* at 9-14. Defendants argued that the AETA was unconstitutionally vague because it overcriminalized conduct which invited arbitrary enforcement by law enforcement officers. *Id.* at 17-19. Finally,

defendants argued that the term "terrorism" in the AETA's non-codified title labeled defendants as "terrorists," violating their substantive due process rights. *Id*. at 21-24.

On March 5, 2015, the district court denied defendants' motion. App. 4-22. The district court held that the AETA is not overbroad because it does not criminalize damage to the intangible property rights of an animal enterprise and, therefore, defendants' argument that AETA criminalizes the loss of profit resulting from protected activity was wrong. *Id*. at 7-13. The district court reasoned that the plain language of the statute exempts from its reach the conduct complained of by the defendants. *Id*. The district court found that the AETA's inclusion of "economic damages" in the penalty provision, but not the offense provision, supported a finding that the AETA did not criminalize loss of intangible property. *Id*. at 9-10. The district court further held that the term "use" in the AETA also indicated that intangible property is not included in the offense provision of the statute because animal enterprises do not "use" intangible property. *Id*. at 10. The district court held that the AETA's damages provision specifically excluded from its reach the loss of profits from lawful protected activity, further indicating the AETA did not intend to criminalize that same conduct. *Id*. Finally, the district

6

court held that the AETA included a limiting provision, specifically exempting First Amendment protected activity from its reach. *Id.* at 11-13.

Next, the district court found that the AETA is not vague, as it contains clearly defined terms and definitions. *Id.* at 15-17. Those terms and definitions provide law enforcement with sufficient guidance as to what constitutes a crime under the AETA and therefore do not permit unfettered discretion by law enforcement to determine whether a crime had been committed. *Id.* at 16-17. The district court specifically noted that the AETA contains a scienter requirement, which alleviates vagueness concerns. *Id.* at 17.

Last, the district court assumed, without finding, that the AETA labels defendants as terrorists. *Id.* at 20. But the district court held that the AETA (and its use of the term "terrorism" in its non-codified title) is rationally related to the legitimate government interest of criminalizing damage to animal enterprises, given animal rights extremists' proven use of acts of violence, threats, and intimidation. *Id.* at 20-22.

On June 26, 2015, defendant Johnson entered a conditional plea of guilty to Count One of the indictment, reserving his right to appeal the district court's denial of his motion to dismiss. R. 124. On July 22, 2015, defendant Lang entered a conditional plea of guilty to Count One of the

indictment, also reserving his right to appeal the district court's denial of his motion dismiss.  R. 126.

On February 29, 2016, defendant Johnson was sentenced by the district court to 36 months' imprisonment, with a 14 month credit for time served in state custody.  R. 150.  On March 23, 2016, defendant Lang was sentenced by the district court to three months' imprisonment, time considered served.  R. 161.

Defendant Johnson timely filed his notice of appeal on March 2, 2016.  R. 152.  Defendant Lang timely filed his notice of appeal on March 30, 2016.  R. 163.

## SUMMARY OF ARGUMENT

The district court correctly denied defendants' motion to dismiss the indictment.  The district court rightly held that the AETA is not overbroad, because it does not criminalize a substantial amount of constitutionally protected speech.  Instead, the AETA criminalizes the intentional damage to tangible property of an animal enterprise.  The AETA also expressly exempts First Amendment-protected activity from its reach.

The district court correctly held that the AETA is not unconstitutionally vague.  The statute clearly defines the conduct that it criminalizes and therefore provides both defendants and law enforcement

sufficient notice as to the type of conduct that falls within its reach.  In addition to clearly defining what is covered under the AETA, it includes a scienter requirement which alleviates vagueness concerns with respect to arbitrary enforcement by law enforcement.

Finally, the district court correctly held that the inclusion of the term "terrorism" in the AETA's title (but not in its codified form) does not violate defendants' substantive due process rights.  The district court found that the AETA was rationally related to a legitimate government interest, which is to curb and combat criminal activity directed at animal enterprises.

## ARGUMENT

### I.   The District Court Did Not Err When It Denied Defendants' Motion to Dismiss the Indictment.

#### A.   Standard of Review

The district court's legal conclusions regarding the constitutionality of the AETA are reviewed *de novo*.  *United States v. Morris*, 821 F.3d 877, 879 (7th Cir. 2016).

#### B.   The AETA is not overbroad.

Defendants argue that the AETA is facially overbroad because it restricts a substantial amount of constitutionally protected activity.  Def. Br. at 10.  Defendants argue that the AETA impermissibly criminalizes First

Amendment activity that results in a loss of profit to an animal enterprise. *Id.* at 12-24.

The Supreme Court has cautioned that the First Amendment overbreadth doctrine is "'strong medicine' that should not be casually employed." *United States v. Williams*, 553 U.S. 285, 293 (2008) (internal quotations omitted).   "The scope of the First Amendment doctrine . . . must be carefully tied to the circumstances in which facial invalidation of statute is truly warranted." *New York v. Ferber*, 458 U.S. 747, 769 (1982).

Defendants have alleged a facial overbreadth attack, citing First Amendment implications.  Def. Br. at 10.  Because defendants allege First Amendment infringement, such an attack is permitted, but the defendants must show that the law "reaches a *substantial amount* of constitutionally protected conduct." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494 (1982) (emphasis added). The "mere fact that one can conceive of *some* impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge." *Members of City Council of L.A. v. Taxpayers of Vincent*, 466 U.S. 789, 800 (1984) (emphasis added). In fact, rarely, if ever, will an overbreadth challenge succeed against a law or regulation that is not specifically addressed to speech or to conduct necessarily associated with speech. *Broadrick v. Oklahoma*, 413 U.S. 601,

613-15 (1973). "Facial overbreadth has not been invoked when a limiting construction has been or could be placed on the challenged statement." *Id*. at 613.

Applying that standard, the district court held that the AETA is not overbroad. App. 7-13. The district court first interpreted the statute itself and found that it was not directed at speech and does not reach a substantial amount of constitutionally protected activity. *Id*. at 9-11. Specifically, the district court held that, contrary to defendants' position, the AETA does not criminalize damage to an animal enterprise's intangible property and therefore does not criminalize conduct that results solely in the loss of profits to an animal enterprise. *Id*. at 9-10. Instead, the district court held that the AETA only criminalizes damage to tangible property. *Id*. The district court reasoned that the plain language of the statute excludes loss to intangible property from the AETA's reach. *Id*. at 9-10. The district court held that Congress's use of the term "economic damage" in the penalties provision of the statute, but omission of the word "economic" in the offense provision, indicates that Congress did not intend for the offense provision to criminalize purely economic damage to an animal enterprise. *Id*. The district held that, in any event, the statute expressly exempts First Amendment protected activity from its reach. *Id*. at 11-13.

The district court's interpretation was correct. As the district court held, App. 9-10, the definition of the offense does not include causing "economic damage," although Congress included the term "economic damage" in the penalties provision of the statute. *See* 18 U.S.C. §§ 43(b)(2)(A), 43(b)(3)(A), 43(b)(4)(B) (imposing penalties based on whether the "offense results in economic damage," and the amount of that economic damage). The elements of "the offense" are the intentional acts specified in subsections (a)(2)(A) and (a)(2)(B), neither of which includes the term "economic damage." On this reading of the statute, economic damages may be taken into account only in determining what penalty to impose once a violation of section (a)(2)(A) or (a)(2)(B) has been found. Therefore, economic damage cannot, standing alone, give rise to liability under the statute. *See United States v. Buddenberg*, No. CR-09-00263 RMW, 2009 WL 3485937 at *6 (N.D. Cal. Oct. 28, 2009) ("The alleged overbreadth of the [economic damages provision] would appear at most to relate to punishment for violations of §§ 43(a)(1) and (2)(A)").[3]

---

[3] The defendants in *Buddenberg* were charged with violating section (a)(2)(B) of the AETA, which criminalizes intentionally placing an individual in a reasonable fear of death or bodily injury as a result of a course of conduct that involves threats and harassment. 2009 WL 3485937, at *1. The defendants in *Buddenberg* attempted to argue that section (a)(2)(A), the section charged in this case, was overbroad. *Id.* However, the court held that defendants lacked standing to challenge section (a)(2)(A) and therefore limited its analysis to section (a)(2)(B). *Id.* at 2-4. The

Indeed, if Congress had intended to include loss of profits as an actionable offense, it would have included the defined term "economic damage" in the offense provision, but it did not. And "[i]t is well settled that where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Duncan v. Walker*, 533 U.S. 167, 172 (2001) (internal quotations omitted). This principle is consistent with the district court's analysis:

> the AETA implements a two-step process. In step one, the government must first prove (in addition to the other elements) that the defendant intentionally damaged or caused the loss of any real or personal property. In step two, the AETA imposes penalties on the defendant based in part on the amount of "economic damage," which is defined to include "loss of profits," that results from the offense—the greater the lost profits, or other economic damages, the greater the penalties. As the government argues, the specific inclusion of the defined term "economic damage" in the penalties provision of the statute, but not in the offense conduct, indicates that Congress did not intend to criminalize conduct that solely causes economic loss as damage to property. The Court agrees that if Congress intended to criminalize purely economic damages as damage to property, it would have included that defined term in the offense conduct.

App. 9-10 (citations omitted).

The district court next reasoned that the use of the term "used by" in the AETA indicates that the statute criminalizes damage to tangible property

---

*Buddenberg* Court found that section (a)(2)(B) was not unconstitutionally overbroad. *Id.* at 6.

13

only.  App. at 10; *see* 18 U.S.C. § 43(a)(2)(A) (offense prohibits damage to "real or personal property" which must be "used" by an animal enterprise).  The district court held that because intangible lost profits are not *used* by an animal enterprise, they are not included in the AETA's offense provision.  *Id.*  An animal enterprise does not "use" lost profits or business; instead, it uses tangible property, such as money, land, employees, phone and computer systems.  The district court noted:

> Defendants argue that businesses use "money," and thus the Court should interpret "the loss of any real or personal property . . . used by an animal enterprise" to include lost profits.  This interpretation asks too much of the plain language of the statute.  As the government noted at oral argument, "money" is very different from intangible lost profits.  A more natural reading is that the offense conduct requires damage to property used by an animal enterprise, which cannot include purely economic damages, and then once property damage is shown, the penalties provision takes into account a wider range of effects of the defendant's conduct, including lost profits to the animal enterprise, in imposing a penalty.

*Id.*

Last, the district court held the AETA expressly exempts from the damages provision any loss of profits due to public reaction to animal rights activists' effective, but lawful, campaign.  App. 10-11.  The district court noted that it would make no sense at all for Congress to expressly exempt "loss of profits" due to any lawful economic disruption from the economic

14

damages provision, yet criminalize damage to an animal enterprise based on the loss of profits alone.  App. 10-11.

Again, the district court's interpretation is supported by the plain reading of the statute:  the damages provision of the AETA provides that once a person is found guilty of "a violation of" the AETA, he or she can be punished to varying degrees depending on the economic damage or bodily harm resulting from the offense. 18 U.S.C. § 43(b). Congress defined "economic damage" to include "loss of profits or increased costs," but explicitly exempted from the definition "any lawful economic disruption (including a lawful boycott) that results from lawful public, governmental, or business reaction to the disclosure of information about an animal enterprise." 18 U.S.C. § 43(d)(3).  As the district court stated, it defies logic that the AETA would exempt loss of profits resulting from protected activity from its damages provision, but yet make the loss of profits resulting from protected activity a crime.

Moreover, setting aside the fact that the plain reading of the statute makes clear that the AETA does not criminalize damage to an animal enterprise's intangible property and therefore is not directed at speech and does not cover a substantial amount of protected activity, the district court held that to the extent the statute covers speech or expressive conduct, the

15

rules of construction forbid a prosecution that would violate the First Amendment. App. 11.

The district court's finding is supported by the statute and the law. The AETA contains a limiting provision that it not be read to prohibit any expressive conduct protected by the First Amendment. 18 U.S.C. § 43(e). And courts interpreting such provisions have held that a limiting provision is helpful in keeping a statute from running afoul of constitutionally protected activity. "When a federal court is dealing with a federal statute challenged as overbroad, it should [] construe the statute to avoid constitutional problems, if the statute is subject to such a limiting construction." *Ferber*, 458 U.S. at 769 n. 24. *See also CISPES v. FBI*, 770 F.2d 468, 474 (5th Cir. 1985) (holding that a nearly identical provision "is a valuable indication of Congress' concern for the preservation of First Amendment rights *in the specific context of the statute in question*") (emphasis added).

In addition, a statute with identical rules of construction has been upheld as constitutional. *United States v. Bird*, 124 F.3d 667, 683 (5th Cir. 1997) (holding that the Freedom of Access to Clinic Entrances Act [FACE] is not unconstitutionally overbroad, in part, because of its "rules of construction," which are identical to the AETA's); *American Life League, Inc. v. Reno*, 47 F.3d 642, 649 (4th Cir. 1995) ("the Act's [FACE's] statement of

purpose and rules of construction indicate that the Act was not passed to outlaw conduct because it expresses an idea.").

Finally, the district court noted that the legislative history supported its reading of the drafters' intent. App. 11-13. Specifically, the district court noted that Congress passed the AETA to provide another tool to combat "violent acts" such as "arson, pouring acid on cars, mailing razor blades, and defacing victims' homes." 152 Cong. Rec. H8590-01 (2006). Yet, at the same time, it was clear that the statute was not intended to criminalize First Amendment protected activity: "It goes without saying that first amendment freedoms of expression cannot be defeated by statute. However, to reassure anyone concerned with the intent of this legislation, we have added in the bill assurances that it is not intended as a restraint on freedoms of expression such as lawful boycotting, picketing or otherwise engaging in lawful advocacy for animals." 152 Cong. Rec. H8590-01 (statement of Rep. Scott).

The district court's reliance on legislative history is well-placed. While legislative history is not consulted when a statute is unambiguous, ambiguity is alleged here and so the legislative history is instructive. *National Labor Relations Board v. Bell Aerospace Company Division of Textron, Inc.*, 416 U.S. 267, 275 (1974); *Martinez v. United States*, 803 F.3d 878, 883 (7th Cir. 2015); *Monterey Coal Co. v. Federal Mine Safety and Health Review Commission*,

743 F.2d 589, 593-96 (7th Cir. 1984). The AETA's legislative history indicates that Congress did not intend for the AETA to criminalize First Amendment protected activity. "I fully recognize that peaceful picketing and public demonstrations against animal testing should be recognized as part of our valuable and sacred right to free expression. For this reason, all conduct protected by the First Amendment is expressly excluded from the scope of this legislation. This law effectively protects the actions of the law-abiding protestor while carefully distinguishing the criminal activity of extremists." 152 Cong. Rec. S9254-01 (2006) (statement of Sen. Feinstein).

Nevertheless, defendants contend that the statute prohibits a "vast" amount of First Amendment protected activity. Def. Br. at 12-24. Specifically, defendants continue to argue that the "plain meaning" of the statute punishes damage to "any property," which includes intangible property, such as lost profits resulting from First Amendment protected activity. Def. Br. at 12-13. But as the district court held, defendants' argument looks at the provision "any property" in a vacuum and requires the reader to ignore the rest of the statute. App. 9-11.

The same applies to defendants' more specific arguments concerning the district court's interpretation of the statute. Specifically, defendants argue that the district court's interpretation of the statute is flawed because

the term "any property" and the definition of "economic damage" are not contained in the same provision of the statute and because the term "used" appears in reference to the animal enterprise's property, but not to the property of a person or entity associated with the animal enterprise.  Def. Br. at 17-21.

Defendants' argument concerning the omission of the term "economic damages" from subsection (a) requires a strained reading of the statute; Congress used "any real or personal property" in subsection (a), and used "economic damage" in subsection (b).  It was not necessary, as defendants contend (Def. Br. at 18-19) without authority, for Congress to use the phrases together in the same provision in order to read them together as the district court did:  "the specific inclusion of the defined term 'economic damage' in the penalties provision of the statute, but not in the offense conduct, indicates that Congress did not intend to criminalize conduct that solely causes economic loss as damage to property.  The Court agrees that if Congress intended to criminalize purely economic damages as damage to property, it would have included that defined term in the offense conduct."  App. 9-10.

As for defendants' argument regarding the omission of the term "used" in the second portion of § 43(a)(2)(A)—"any real or personal property of a person or entity having a connection to, relationhip with, or transactions with

19

an animal enterprise," that omission is hardly fatal to the district court's interpretation of the statute. As we have explained above, the district court's interpretation of the statute is based on a plain reading of the *entire* statute. The district court provided specific examples of language used in the statute that informed its overall reading of the statute, none of which alone were dispositive. Defendants now attempt to parse each one of those examples to distract from the overall reading, which specifically includes "economic damages" in the damages provision but not the offense provision, requires that an animal enterprise "use" its property, exempts from its damages calculation loss of profit from peaceful protest and prohibits a prosecution based on First Amendment-protected activity.

Defendants set forth a specific example that they contend supports their argument. They claim that the producers of *Blackfish*, a documentary exposing animal cruelty employed by trainers at SeaWorld, resulted in significant loss of profits to that animal enterprise. Def. Br. at 22-23. Defendants argue that, while the documentary was a constitutionally protected expression of free speech, the producers of the documentary could be—but have not been—prosecuted under the AETA. *Id*. But, as with their interpretation of specific words within the AETA, their example requires the statute's reader to ignore the statute's plain language, carve-out

provision, and limiting provision.  Indeed, the AETA's carve-out and limiting provision relate directly to defendants' example—they would specifically prohibit the government from bringing the *Blackfish* prosecution under the AETA.

Defendants argue that the Third Circuit has held that "caus[ing] the loss of property by increasing the target animal enterprise's business costs" is covered by the language of the AETA that prohibits damage to "any real or personal property."  Def. Br. at 14-15.  The case to which defendant cites interpreted the Animal Enterprise Protection Act, which was the predecessor to the AETA and which criminalized "physical disruption" to an animal enterprise.  *United States v. Fullmer*, 584 F.3d 132 (2009).  The defendants in *Fullmer* were convicted of intentionally "physically disrupting" the operations of an animal enterprise, the language of the AEPA that has been removed in the AETA.  *Id.* at 152-53.  In any event, the *Fullmer* ruling is not helpful to defendants' argument.  The defendants in *Fullmer* argued that the district court had improperly instructed the jury.  *Id.* at 159.  According to the defendants, the trial court in *Fullmer* "should have instructed the jury that they first had to 'find damage or loss of any property used by the animal enterprise,' or a conspiracy to do so," and "only then should the jury have calculated economic damage, which includes lost profits."  *Id.*  *Fullmer* did

21

not expressly find the instructions as given were correct, but rejected this claim of error as harmless: "Defendants' reading of the statute only helps them if the government did not prove a loss exceeding $10,000, exclusive of lost profits.  As previously noted, Huntingdon had to pay $15,000 to replace computer equipment after a protest involving electronic civil disobedience." *Id.*[4]

Defendants now argue that their interpretation of the AETA is consistent with the way in which a different federal law, the Price Anderson Act, has been interpreted—an argument defendants did not make in the district court.  Def. Br. at 15-16.  Defendants' argument has no application to the instant case; there was no plain error.  The Price Anderson Act relates to determining the amount of liability to the public as a result of a "nuclear incident."  42 U.S.C. § 2014.  According to defendants, the Act "governs liability-related issues for non-military nuclear facilities, partially indemnifying the nuclear industry against liability for claims arising from

---

[4] Defendants also argue that the district court's interpretation of the statute is flawed because, under the district court's interpretation, the conduct criminalized in *Fullmer* would not constitute a crime. Def. Br. at 17.  This argument suffers from the same flaw—the *Fullmer* defendants were charged under the AEPA, which criminalized "physical disruption" to an animal enterprise.  *Fullmer*, 584 F.3d at 152-53.  Nevertheless, the *Fullmer* defendants could be prosecuted under the AETA. The *Fullmer* court's description of the damage sustained by the victim was more than "opaque," including dollar figures required to repair computer systems and replace other equipment that was damaged as a result of defendants' conduct.  *Id.* at 141.  Causing damage to a company's computer systems and equipment is damage to tangible property, which would fall under the AETA's purview.

nuclear incidents." Def. Br. at 15. Defendants point to a district court case which found that under that Act, intangible property, such as lost profits, constitute the "property" of a business for purposes of determining civil law damages. *Radiation Sterilizers, Inc. v. United States*, 867 F. Supp. 1465, 1469-72 (E.D. Wash. 1994). This interpretation of civil damages is a far cry from the language and structure of the AETA, which criminalizes the offense of damaging "any real or personal property" of an animal enterprise, but which employs the phrase "economic damage" in the penalty provisions alone. It is hardly persuasive here, and the district court did not plainly err in failing to acknowledge this argument.

Defendants next address the carve-out provision of the statute, which expressly excludes damages resulting from a "lawful economic disruption (including a lawful boycott) that results from lawful public, governmental, or business reaction to the disclosure of information about an animal enterprise." Def. Br. at 21-22. Defendants offer a possible alternative explanation for Congress's inclusion of the carve-out provision, arguing that "perhaps Congress wanted to ensure that certain economic damage could not heighten a defendants' penalty, even if it could serve as a basis for liability." *Id.* But, as the district court noted, that hypothetical is contradicted by a common sense reading of the statute:

It would not make sense for the statute to criminalize the intentional disclosure of information regarding an animal enterprise that intends to cause economic damage (but not other property damage), and then carve an exception out of the penalties provision for losses caused by the same conduct.

App. 10-11. Defendants' hypothetical also is contradicted by what Congress actually said in enacting the statute—the Act was intended to criminalize damage to animal enterprises, while protecting First Amendment protected speech and activity. *Id*. at 11-12.

Defendants also argue that the limiting provision, which expressly protects First Amendment-protected activity, is not dispositive and that the district court erred in relying on it. Def. Br. at 24-28. Defendants first argue that a limiting provision cannot save an otherwise invalid statute. *Id*. at 26. This may be true, but, as set forth above, the AETA is not facially invalid. As the district court found, the AETA is subject to a reasonable interpretation that prevents it from reaching constitutionally protected activity.[5] App at 9-13.

---

[5] The cases cited by defendants on this point are inapposite. Def. Br. at 25. In those cases, the "savings" clauses were far more expansive (exempting any reading of the statutes that would be in violation of state or federal law), or were inconsistent with the actual purpose or language of the statute itself, or involved situations in which the statute was unconstitutional on its face, *i.e.* limited a substantial amount of protected conduct. *See e.g.*, *Waste Management Holdings, Inc. v. Gilmore*, 252 F.3d 316, 333 (4th Cir. 2001), *Fisher v. King*, 232 F.3d 391, 395 (4th Cir. 2000); *State v. Machholz*, 574 N.W.2d 415, n.4 (Minn. Sup. Ct. 1998); *Long v. State*, 931 S.W.2d 285, 295 (Tex. Crim. App. 1996). Here, the limiting provision is not inconsistent with the language of the statute, limiting only some of the conduct that potentially

The district court's finding is consistent with the First Circuit's interpretation of the statute. In *Blum v. Holder*, 744 F.3d 790 (1st Cir. 2014), defendants challenged the constitutionality of the AETA, asserting some of the same arguments asserted here, namely, that the AETA criminalizes loss of profit to an animal enterprise resulting from protected activity. *Id.* at 800. While the First Circuit held that defendants lacked standing to challenge the AETA, the court held that the limiting provision defeated defendants' argument: "[w]e are satisfied that AETA includes safeguards in the form of its expression-protecting rules of construction, which preclude an interpretation according to which protected speech activity resulting in lost profits gives rise to liability under subsection (a)(2)(A)." *Id.* at 801.

Indeed, one case cited by defendants illustrates the distinction between the defendants' argument and this case. In *CISPES*, the Fifth Circuit analyzed the constitutionality of a statute criminalizing the harassment of a foreign official. *CISPES*, 770 F.2d at 472. The statute contained a savings provision which stated that "nothing contained in this section shall be construed or applied so as to abridge the exercise of rights guaranteed under

---

could fall under the statute's purview. It also does not attempt to "save" the statute from any conceivable unconstitutional construction, precluding only those constructions that violate the First Amendment. The limiting provision is therefore consistent with the aim of the statute itself, which is to permit peaceful protest while criminalizing unlawful conduct.

the First Amendment to the Constitution of the United States." *Id*. The Fifth Circuit held that the limiting provision was helpful to the statute where, as here, the statute was otherwise lawful and the limiting provision merely clarified that the statute should not reach constitutionally protected conduct:

> Of course, such a provision cannot substantively operate to save an otherwise invalid statute, since it is a mere restatement of well-settled constitutional restrictions on the construction of statutory enactments. However, it is a valuable indication of Congress' concern for the preservation of First Amendment rights in the specific context of the statute in question. Thus, it serves to validate a construction of the statute which avoids its application to protected expression.

*Id.* The district court thus did not err in relying on the limiting provision: "The Rules of Construction, as well as the AETA's legislative history, serve to validate this interpretation of the statute, which limits it from applying to a significant amount of protected First Amendment expression." App. 13.

Defendants argue that the limiting provision itself is vague and provides insufficient notice as to what conduct it covers, such that it cannot be used to save the statute. Def. Br. at 26-28. But the rules of construction are "no[] more vague than the First Amendment itself." *Hutchins v. District of Columbia*, 188 F.3d 531, 546 (D.C. Cir. 1999). Their existence in the statute "fortifies, rather than weakens, First Amendment values." *Schleifer v. City of Charlottesville*, 159 F.3d 843, 853 (4th Cir. 1998). In any event, the

26

drafters specifically addressed this problem by including in the AETA two explicit examples of conduct that qualifies as First Amendment-protected activity—"peaceful picketing or other peaceful demonstration"—both of which address the heart of defendants' concern with the statute as a whole. Moreover, the fact that defendants can point to some vagueness in what constitutes "expressive conduct" in the limiting provision of the statute does not amount to a showing that the statute as a whole "reaches a substantial amount of constitutionally protected conduct." *Village of Hoffman Estates*, 455 U.S. at 494.

Finally, defendants argue that the conspiracy and attempt provisions of the statute, set forth in subsection (a)(2)(C), refer to the general offense provision in section (a) rather than to the specific offense provisions set forth in subsections (a)(2)(A) and (a)(2)(B). Def. Br. at 28-34. Defendants contend that the conspiracy and attempt provisions therefore would make criminal a mere agreement to use interstate commerce for the purpose of damaging or interfering with the operations of an animal enterprise, without requiring that in connection with that purpose, the parties intend to damage or cause loss of property used by the animal enterprise or intend to place a person in reasonable fear of death or serious bodily injury. *Id.*

Defendants failed to raise this argument below and therefore have forfeited it and so, on that argument, are limited to a plain error review. *United States v. Washington*, 417 F.3d 780, 788 (7th Cir. 2005). In any event, the district court did not err in denying defendants' overbreadth arguments, even taking into account the conspiracy and attempt provisions, which the district court was not asked to do.

Defendants' claims concerning the conspiracy and attempt provisions are belied by a reading of the statute. The AETA contains six subsections that define the "offense." The first three sections set forth the interstate commerce requirement and the purpose for the use interstate commerce:

(a)    Offense. Whoever travels in interstate or foreign commerce, or uses or causes to be used the mail or any facility of interstate or foreign commerce—

(1)    for the purpose of damaging or interfering with the operations of an animal enterprise; and

(2)    in connection with such a purpose—

18 U.S.C. § 43. Thus, while the AETA criminalizes the use of interstate commerce for the purpose of damaging an animal enterprise, it does not stop there. Instead, it requires that there be something done or anticipated "in connection" with that purpose. The next three subsections define what that connection must be:

(A) intentionally damages or causes the loss of any real or personal property (including animals or records) used by an animal enterprise, or any real or personal property of a person or entity having a connection to, relationship with, or transactions with an animal enterprise;

(B) intentionally places a person in reasonable fear of the death of, or serious bodily injury to that person, a member of the immediate family . . . of that person, or a spouse or intimate partner of that person by a course of conduct involving threats, acts of vandalism, property damage, criminal trespass, harassment, or intimidation, or

(C) conspires or attempts to do so . . . .

18 U.S.C. § 43. Under the logical reading of the statute, subsection (C) refers directly to subsections (A) and (B), given that it immediately follows those subsections. Defendants' contrary interpretation is not only inconsistent with the way the statute reads, but would also nullify the "in connection" requirement in subsection (2). And as the First Circuit noted in *Blum*, defendants' reading of subsection (C) also does not square with the legistlative history of the AETA and "would [] render subsection (a)(2)(C) redundant since every time subsection (a)(1) is satisfied so too would be the 'attempt' branch of subsection (a)(2)(C)." *Blum*, 744 F.3d at 803.

Defendants claim that in a recent case charged under the AETA in the Southern District of California, in a Preliminary Trial Memorandum, the government took the position now advanced by defendants—that in order to be guilty of a conspiracy under § 43(a)(2)(C), a defendant need not intend to

29

damage property or threaten a person. Def. Br. at 30. Defendants claim that this position thus leads to overbreadth. *Id.* at 32-34.

The Preliminary Trial Memorandum to which defendants cite has no binding effect—as defendants' brief makes clear, it was a preliminary document filed in anticipation of a trial that did not occur, and upon which no court ever ruled. Def. Br. at 30-31, 31 n.13. It is inconsistent with the position the government has taken in all previous arguments, and which courts have agreed is the logical reading of the statute. *Blum*, 744 F.3d at 802-03; *Buddenberg*, 2009 WL 3485937, at *12. The district court committed no plain error with regard to this argument.

### C.    The AETA is not vague.

Defendants next argue that the AETA is unconstitutionally vague because its broad sweep invites arbitrary enforcement by law enforcement. Def. Br. at 37-42. For their vagueness claim, defendants do not allege the AETA implicates First Amendment concerns.

Nevertheless, defendants argue that they are permitted to make a facial vagueness challenge to the AETA. Def. Br. at 35-36. The district court declined to decide whether a facial challenge was permitted. App. 14-15. However, because defendants' vagueness challenge does not relate to First Amendment concerns (they were charged with vandalizing property), they

30

are limited to making an as-applied challenge.  *See Maynard v. Cartwright*,
486 U.S. 356, 361 (1988) ("Vagueness challenges to statutes not threatening
First Amendment interests are examined in light of the facts of the case at
hand; the statute is judged on an as-applied basis"); *United States v. Lim*, 444
F.3d 910, 915 (7th Cir. 2006) ("Vagueness challenges that do not involve First
Amendment freedoms must be analyzed as applied to the specific facts of the
case at hand").[6]  And as-applied, defendants' arguments fail.  The statute
clearly criminalizes destruction and vandalism to a mink farm, specifically
including the release of animals and destruction of breeding cards.  18 U.S.C.
§43(a)(2)(A).  The district court declined to decide whether defendants were
limited to an as-applied challenge, but their facial challenge fails as well.

"A vagueness claim alleges that, as written, the law either fails to
provide definite notice to individuals regarding what behavior is criminalized
or invites arbitrary and discriminatory enforcement—or both."   *Bell v.*

---

[6] None of the cases to which defendants cite, Def. Br. at 35-36, actually dealt with
standing and, in any event, all involved challenges that were both facial and as-
applied.  *Johnson v. United States*, —U.S.—, 135 S.Ct. 2551, 2556, 192 L.Ed.2d 569
(2015) (defendant's own prior conviction was challenged and then Supreme
Court invited vagueness argument); *Kolender v. Lawon*, 461 U.S. 352, 356 (1983)
(defendant himself had been stopped under the vague ordinance 15 times and it was
unclear to  him what constituted "credible and reliable" identification); *United
States v. Rodgers*, 755 F.2d 533, 543 (7th Cir. 1985) (defendant made a void for
vagueness argument "both on its face and as-applied"); *United States v. Walton*, 36
F.3d 32, 35 (7th Cir. 1994) ("[n]one of the dangers of vagueness are implicated by
the [Act] and [defendant's] conduct, to which he pled guilty, falls quite clearly
within the statutory prohibitions").

*Keating*, 697 F.3d 445, 455 (7th Cir. 2012).   Where a defendant, as here,

alleges the second type of vagueness claim, that a statute invites arbitrary

and discriminatory enforcement, that claim must establish that the statute

"impermissibly delegates to law enforcement the authority to arrest and

prosecute on 'an ad hoc and subjective basis.'" *Id.* at 462 (internal quotations

omitted).   A statute is not void for vagueness, however, "simply because it

requires law enforcement to exercise some degree of judgment."   *Bell*, 697

F.3d at 462.

> The district court found that the AETA is not unconstitutionally vague:

> the AETA . . . clearly defines the conduct it criminalizes.  In order
> to violate the section of the AETA challenged by Defendants, an
> individual must, among other requirements, "intentionally
> damage[] or cause the loss of any real or personal property
> (including animals or records) used by an animal enterprise." 18
> U.S.C. § 43(a)(2)(A).   Unlike the other statutes cited by
> Defendants, this provision narrowly targets acts that
> intentionally cause property damage or loss.  Further, the AETA
> imposes the additional mens rea requirement that an individual
> act "for the purpose of damaging or interfering with the
> operations of an animal enterprise." 18 U.S.C. § 43(a)(1).  The
> AETA's proscribed conduct is simply not the type of "sweeping
> standard" that gives unfettered discretion to law enforcement.  In
> other words, law enforcement does not have discretion to
> determine whether a vague term amounts to criminal conduct.
> The underlying criminal activity is clearly proscribed.  Although
> Defendants argue that the AETA criminalizes conduct taken
> against a large number of entities because the definition of
> "animal enterprise" is broad, the fact that the AETA criminalizes
> clearly defined conduct against a wide range of potential victims
> does not lead to "arbitrary and erratic arrests and convictions."

App. 16-17 (citations omitted).

The district court's ruling is correct. Because the AETA contains no vague or ambiguous terms that would permit unfettered law enforcement discretion in deciding whether a crime has been committed, it is distinguishable from cases in which courts have found a statute to be vague. For example, in *Papachristou*, cited by defendants, eight defendants were convicted of violating Florida's "vagrancy" law, which contained multiple vague and undefined terms:

> Rogues and vagabonds, or dissolute persons who go about begging, common gamblers, persons who use juggling or unlawful games or plays, common drunkards, common night walkers, thieves, pilferers or pickpockets, traders in stolen property, lewd, wanton and lascivious persons, keepers of gambling places, common railers and brawlers, persons wandering or strolling around from place to place without any lawful purpose or object, habitual loafers, disorderly persons, persons neglecting all lawful business and habitually spending their time by frequenting houses of ill fame, gaming houses, or places where alcoholic beverages are sold or served, persons able to work but habitually living upon the earnings of their wives or minor children shall be deemed vagrants.

*Papachristou v. City of Jacksonville*, 405 U.S. 156, 158, n. 1 (1972).

In striking down the statute, the Supreme Court explained that the terms used in the vagrancy statute no longer had any application or meaning to the average citizen: "The poor among us, the minorities, the average householder are not in business and not alerted to the regulatory schemes of

33

vagrancy laws; and we assume they would have no understanding of their meaning and impact if they read them." *Id*. at 162-63. This is a far cry from the AETA, which criminalizes specific conduct:  intentionally damaging the tangible property of an animal enterprise.

When the AETA is read in a straightforward, logical way, with an eye toward Congress's intent, "it is clear what the [law] as a whole prohibits"— intentionally damaging the tangible property of an animal enterprise. While one can "conjure up hypothetical cases in which the meaning of these terms will be a nice question," *American Communications Association v. Douds*, 339 U.S. 382, 412 (1950), "speculation about possible vagueness in hypothetical situations not before the Court will not support a facial attack on a statute when it is surely valid in the vast majority of its intended applications." *Hill v. Colorado*, 530 U.S. 703, 733 (2000) (internal quotation omitted). Because the AETA is not vague as to either defendant's conduct or its other applications, the vagueness claim must fail.

The district court also found that the presence of a scienter requirement narrows the AETA and prevents law enforcement from having unfettered discretion in determining whether a crime had been committed. App. 17.  The district court's finding is consistent with Supreme Court precedent holding that the presence of a *mens rea* requirement saves a

statute from vagueness: "The Court has made clear that scienter requirements alleviate vagueness concerns." *Gonzalez v. Carhart, et al.*, 550 U.S. 124, 149 (2007). *See also Colautti v. Franklin*, 439 U.S. 379, 395 (1979) ("This Court has long recognized that the constitutionality of a vague statutory standard is closely related to whether that standard incorporates a requirement of *mens rea*"); *Fullmer*, 584 F.3d at 153 (the AEPA is not unconstitutionally vague because it included a scienter requirement); *Rodgers*, 755 F.2d at 544 ("The statute simply is not so vague as to create a meaningful danger of arbitrary law enforcement, and any problems with the notice it provides . . . are alleviated by the intent requirement. [The statute] is no more, and possibly less, vague than other broadly-phrased federal criminal statutes that we have consistently upheld over vagueness and overbreadth challenges," citing mail fraud, Anti-Riot Act, and Travel Act).

Defendants now argue that in order to be unconstitutionally vague, the statute need not contain indefinite language, so long as it still invites arbitrary enforcement. Def. Br. at 37-39. But the two concepts are interrelated. While it is true that there need not be one vague or unclear term to find vagueness, arbitrary and discriminatory enforcement results from a lack of precision in the statute—and leaves law enforcement free to determine on their own whether a crime has even been committed. The

AETA not only clearly defines what is criminalized—it contains no vague terms—but those definitions also provide law enforcement with sufficient direction in determining whether a crime has in fact been committed.

The cases cited by defendant in support of their argument are inapposite. First, in *Metro Produce Distributors, Inc. v. City of Minneapolis*, 473 F. Supp. 2d 955, 961 (D. Minn. 2007), a city ordinance prohibited the "idling" of various motor vehicles while stopped, standing, or parked in a residentially used area at night. The court noted that while the meaning of the term "idle" is clear, the statute failed to define the amount of time that a car must idle before it is in violation of the statute. *Id.* Accordingly, law enforcement officers were invited to arbitrarily enforce the statute because they had discretion in determining whether the statute had been violated at all: "This vagueness provides city officials unfettered discretion to apply the ordinance in an arbitrary manner. For example, an official could cite one motor vehicle for remaining stationary one minute and pass over another motor vehicle that remained stationary for thirty minutes." *Id.* at 961. That is not the case here where the statute clearly defines what is criminalized—intentionally damaging the tangible property of an animal enterprise.

Next, defendants cite to *United States v. Vest*, 448 F. Supp. 2d 1002 (S.D. Ill. 2006). But *Vest* involved a fact-specific challenge to the firearms

statute, specifically the prohibition on possession of a machine gun.  *Id.* at 1004-1005.  In that case, the defendant was a police officer and the statute created an exception for those possessing a machine gun under "proper authority."  *Id.*  The court held that there was no clear direction as to what constitutes acting under "proper authority," such that neither prospective defendants, nor law enforcement officers enforcing the statute, could possibly know whether a person had committed the crime or not.  *Id.* at 1009-1010. This is again different from the instant case where the AETA criminalizes the intentional damage to tangible property of an animal enterprise.

The ordinance to which defendants refer in *Act Now to Stop War and End Racism Coalition, et al., v. District Of Columbia*, 905 F. Supp. 2d 317 (D.C.D.C. 2012), also is distinguishable.  Def. Br. at 39-40.  First, the ordinance in *Act Now* regulated speech—the content of a sign announcing an event.  *Id.* at 326-27.  The *Act Now* court noted that when an ordinance regulates speech, more specificity is required.  *Id.* at 331-32.  Second, in *Act Now*, the plain language of the ordinance allowed for unfettered discretion by law enforcement, as it specifically provided that the law enforcement officer would use his/her judgment to determine whether the ordinance applied: an

37

"inspector" would "reasonably determine" whether a poster related to an event or not. *Id.* at 332.[7]

Defendants' next argument as to vagueness relates back to the sweep of conduct that is covered by the statute. Defendants argue that the statute covers innumerable property crimes across the United States that are discriminatorily enforced against animal rights activists, making it akin to a modern-day vagrancy statute. Def. Br. at 40-42.[8] But as the district court rightly held, that fact does not make the statute vague. Rather, it is a clearly defined statute that seeks to curb criminal behavior against animal enterprises while protecting the right of free speech and demonstration.

---

7 Defendants also rely on *JWJ Indus., Inc. v. Oswego* County, No. 5:09-cv-740, 2012 U.S. Dist. LEXIS 16279, at *19-20 (N.D.N.Y. Nov. 16, 2012), but the Second Circuit later found the ordinance provided sufficient notice as to what it prohibited. *JWJ Industries, Inc. v. Oswego County*, No. 12-5014-CV, 538 Fed. Appx. 11 (2d Cir. Sept. 4, 2013).

8 The cases cited by defendants in support of this argument are distinguishable. The statute in *United States v. Lanning*, 723 F.3d 476, 483 (4th Cir. 2013), was not actually deemed unconstitutionally vague on its face, but instead was determined to be vague as applied. *Id.* at 481-82. In *Lanning*, the defendant was charged after he briefly touched the groin area of an undercover officer who had expressly consented to a sexual encounter with the defendant. *Id.* The Court held the statute's "obscenity" prong to be vague as applied because it was unclear that the defendant's conduct was in fact obscene. *Id.* at 483-84. In any event, the statute in *Lanning* contained terms that are nowhere present in the AETA, criminalizing conduct that is "obscene," "physically threatening or menacing," or "likely to inflict injury or incite an immediate breach of the peace." *Id.* at 478. And the ordinance in *Desertrain v. City of Los Angeles*, 754 F.3d 1147, 1156-57 (9th Cir. 2014), lacked any precision or definitions whatsoever, such that law enforcement had unfettered discretion to arrest homeless individiuals.

As a final matter, defendants contend that the AETA is discriminatorily enforced, claiming that the only individuals prosecuted under the AETA are animal rights activists. Def. Br. at 41. Defendants are wrong when they argue that the AETA has never been used to prosecute an individual without ties to the animal rights movement. Specifically, in 2008, Richard Sills was charged under the AETA with planting a fake bomb at a California university.     R. 88 at 18, Ex. C. (government's sentencing memorandum and plea agreement). In that case, while Sills originally claimed to have acted on behalf of an animal rights organization, he in fact was a university employee and had no known ties to the animal rights community at all. *Id.*

Setting aside that prosecution, however, given that the AETA's legislative history reflects that Congress enacted the statute to combat the rising threat of animal rights extremists, it should come as no surprise that the statute will ordinarily apply to those individuals willing to engage in unlawful acts on behalf of their cause. What is clear, though, is that the AETA is not, nor was it intended to be, a way to oppress lawful protest or to discriminate against a group based on their lawful expression of ideas.

The district court properly rejected defendants' vagueness challenge.

**D.    The AETA does not violate defendants' substantive due process rights.**

Defendants argue that the fact that the term "terrorism" is present in the AETA's non-codified title labels defendants as terrorists and that label violates the defendants' substantive due process rights.  Def. Br. at 43-46. Defendants further argue that the AETA is not rationally related to a legitimate government interest.  *Id.* at 46-50.

Courts must use extreme care in evaluating, let alone in granting, a substantive due process challenge. *See Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992) ("As a general matter, the Court has always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended.  The doctrine of judicial self-restraint requires us to exercise the utmost care whenever we are asked to break new ground in this field") (internal quotations omitted).

That is particularly true where the right implicated is a non-fundamental one, which defendants assert is affected here.  Def. Br. at 43. For non-fundamental rights, "there is a residual substantive limit on government action which prohibits arbitrary deprivations of liberty by government." *Hayden ex rel. A.H. v. Greensburg Community School. Corp.*, 743 F.3d 569, 576 (7th Cir. 2014).  "Where a non-fundamental liberty—

40

sometimes described as a 'harmless liberty'—is at stake, the government need only demonstrate that the intrusion upon that liberty is rationally related to a legitimate government interest." *Id.* (citation omitted). "It is irrelevant whether the reasons given actually motivated the legislature; rather, the question is whether some rational basis exists upon which the legislature could have based the challenged law." *Goodpaster v. City of Indianapolis*, 736 F.3d 1060, 1071 (7th Cir. 2013) (internal citations omitted). "Those attacking a statute on rational basis grounds have the burden to negate 'every conceivable basis which might support it.'" *Id.*

Here, no right of the defendants is implicated because the AETA does not label anyone as anything—it merely includes the term "terrorism" in its title, but does not further include it in the codified title or as an element of the statute. The inclusion of the term is therefore essentially meaningless.

Assuming that a non-fundamental right of the defendants was implicated, however, the district court found that the AETA does not violate defendants' substantive due process rights, despite the inclusion of the term "terrorism" in the statute's title. App. 18-19. The district court found that the AETA's purpose was rationally related to a legitimate government interest—the prevention of violence, harassment, and acts of terror committed by animal rights extremists. *Id.* at 19-22.

41

The district court's holding that the passage of the AETA was rationally related to a legitimate government interest is correct.  In passing the AETA, Congress spelled out the violent and harassing acts committed by animal extremists that the statute intended to combat.  App. 20-21.  The district court provided compelling examples of this problem, including the use of violence and intimidation, threatening letters and emails, mailing razor blades, and public dissemination of private information.  *Id.* at 21.

The district court also rightly found that the government has a legitimate interest in preventing this type of harassment.  App. 21-22.  The government has an interest in protecting its citizens, who are engaged in lawful employment, from being hurt, harassed, or threatened.  And passing a statute to specifically criminalize such behavior is rationally related to that purpose.

Nevertheless, defendants argue that the use of the term "terrorism" in the title of the AETA is not related to a government interest because the individuals charged under the AETA are largely non-violent offenders.  Def. Br. at 46-50.  And defendants insist that the AETA punishes its violators as "terrorists."  *Id.* at 44.

The AETA does nothing of the sort.  To be sure, the non-codified title of the AETA includes the term "terrorism."  But that term was not included in

the codified version of the statute, nor was it included anywhere within the text of the AETA itself, either in the elements or punishment provisions. The use of the term "terrorism" in the title of AETA therefore has no practical effect. The AETA is not codified under the federal terrorism statutes, 18 U.S.C. § 2332b(g)(5)(B), and the government need not prove that the defendants acted as "terrorists" in order to sustain a conviction. Defendants convicted under the AETA are not required to register as terrorists, nor are convicted defendants automatically subject to any sentence enhancement based on having committed a terrorist act. And despite defendants' assertions that a conviction under this statute bears on their status with the Bureau of Prisons, it does not. As the government explained both in oral argument and its Response to Defendants' Motion to Dismiss (R. 88 at 19-21), while a conviction under the AETA means the prospective prisoner's case is automatically seen by a counter-terrorism employee, Def. Br. at 44, that fact has no ultimate bearing on the individual's designation within the Bureau of Prisons. R. 88 at 19-21.[9] Instead, in determining a defendant's BOP designation, every aspect of the prisoner's background, including the facts of his crime, are considered. *Id.* Therefore, while the facts of one terrorism

---

[9] The government's conclusions were based on interviews with Bureau of Prisons employees. R. 88 at 19-21.

conviction may lead to heightened security concerns, another terrorism conviction may not. *Id.*

In sum, the AETA does not punish those convicted under it as terrorists—a fact that makes it entirely distinct from other terrorism statutes that are codified as such and come with enhanced penalties. *See, e.g.,* 18 U.S.C. § 2332b(g)(5)(B). In fact, § 43(a) is excluded from the list of federal crimes of terrorism contained in 18 U.S.C. § 2332b(g)(5). Any social stigma born by those convicted under AETA passes rational-basis review, given the types of crimes sought to be punished by the Animal Enterprise Terrorism Act. Examples are set forth above—the extremist movement is responsible for acts of arson, violence, harassment, stalking and threats. And while there are individuals convicted under the AETA who commit low-level property crimes, those low-level property crimes can be seen as part of a larger campaign by animal rights extremists to instill fear—and that campaign of terror is exactly what the AETA was intended to curtail. The legislative history clearly states that the statute was passed because of the "increase in the number and the severity of criminal acts and intimidation against those engaged in animal enterprises." *See* 152 Cong. Rec. H8591 (2006) (Statement of Rep. Sensenbrenner).

Defendants do not, because they cannot, refute this rational basis. Instead, defendants posit the novel argument that this Court must determine whether every crime charged under the AETA "can rationally be labeled 'terrorism.'" Def. Br. at 47. Defendants do not, however, cite to any authority to support the argument that substantive due process requires that a statute's title must appropriately characterize every crime committed under the statute. To the contrary, this Court need only determine whether the statute itself is rationally related to a legitimate government interest. The district court committed no error here.

## CONCLUSION

For the foregoing reasons, this Court should affirm the district court's denial of defendants' motion to dismiss.

Respectfully submitted,

ZACHARY T. FARDON
United States Attorney

STUART D. FULLERTON
Assistant United States Attorney
Editor

By:     *s/ Bethany K. Biesenthal*
BETHANY K. BIESENTHAL
Assistant United States Attorney
219 South Dearborn Street
Chicago, Illinois  60604
(312) 886-7629

46

## <u>RULE 32 CERTIFICATION</u>

I hereby certify that:

1.     This brief complies with the type volume limitation of Federal Rules of Appellate Procedure 32(a)(7)(B) because it contains no more than 11,515 words; and

2.     This brief complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5), 32(a)(6), and Circuit Rule 32(b),  because it has been prepared using the Word proportionally-spaced typeface of Century Schoolbook with 13-point font in the text and 12-point font in the footnotes.

Respectfully submitted,

ZACHARY T. FARDON
United States Attorney

By:     *s/ Bethany K. Biesenthal*
BETHANY K. BIESENTHAL
Assistant United States Attorney
219 South Dearborn Street
Chicago, Illinois  60604
312 886-7629

## CERTIFICATE OF SERVICE

I hereby certify that on July 7, 2016, I electronically filed the foregoing CONSOLIDATED RESPONSE BRIEF OF THE UNITED STATES with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Respectfully submitted,

ZACHARY T. FARDON
United States Attorney

By:  s/ Bethany K. Biesenthal
BETHANY K. BIESENTHAL
Assistant United States Attorney
219 South Dearborn Street
Chicago, Illinois  60604